# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 21, 2020

Lyle W. Cayce
Clerk

———————

No. 19-70010

———————

United States of America,

*Plaintiff—Appellee*,

*versus*

Len Davis,

*Defendant—Appellant*.

———————

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:12-CV-752
USDC No. 2:94-CR-381-1

———————

Before Owen, *Chief Judge*, and Willett and Oldham, *Circuit Judges*.

Andrew S. Oldham, *Circuit Judge*:

Len Davis was an officer in the New Orleans Police Department ("NOPD"). He used his position and the NOPD's resources to orchestrate the murder of Kim Groves. The United States prosecuted Davis for capital murder. A jury convicted him. He was sentenced to death. Davis unsuccessfully appealed and then moved for postconviction relief under 28 U.S.C. § 2255. The district court denied his claims and denied him a Certificate of Appealability ("COA"). We likewise deny a COA.

No. 19-70010

## I.

## A.

On October 10, 1994, Kim Groves witnessed an NOPD police officer pistol-whipping her nephew. *See United States v. Davis*, 609 F.3d 663, 670 (5th Cir. 2010). That quite obviously upset Groves. So she filed a police-brutality complaint with the NOPD's office of internal affairs. *See ibid.* It turns out that the pistol-whipper policeman was Len Davis's NOPD partner, Sammie Williams.

Davis learned of the police-brutality complaint on October 12, 1994. Davis was enraged. So Davis called a drug dealer named Paul Hardy and asked him to murder Groves. Davis and Hardy routinely exchanged favors. On this occasion, Davis offered to help plan the murder; then, after Hardy committed it, Davis would cover Hardy's tracks at the crime scene. *Ibid.*

On October 13, 1994, Davis invited Hardy and another accomplice, Damon Causey, to the police station so that they could see crime-scene photos. *Ibid.* Davis then drove them around in his police cruiser so that Hardy could see Groves's neighborhood. *Ibid.*; *United States v. Causey*, 185 F.3d 407, 415 (5th Cir. 1999).[1] Later that same night, Davis drove around in his police cruiser looking for Groves. When Davis spotted her, he paged Hardy and then gave him Groves's location. *Causey*, 185 F.3d at 415. Hardy went to that location, found Groves, and shot her in the head. Groves died. Sitting by his police radio an hour or two later, Davis heard police chatter about a murder. He radioed an on-duty officer to confirm Groves was dead. She was 32 years old.

---

[1] The United States prosecuted Davis, Causey, and Hardy together. And the defendants appealed together. We first considered their appeals together in the *Causey* case, which is why we cite it for the factual and procedural background of Davis's case.

No. 19-70010

While Hardy upheld his end of the bargain, Davis did not. The FBI had been wiretapping Davis as part of an investigation into drug sales and corruption in the NOPD—"Operation Shattered Shield." *Davis*, 609 F.3d at 671. These Shattered Shield recordings included Davis's calls with Hardy and Davis's conversations planning Groves's murder. With this evidence in hand, the Government indicted Davis for (1) conspiring to deprive Groves's civil rights, in violation of 18 U.S.C. § 241, (2) depriving her of those civil rights under color of law, in violation of 18 U.S.C. § 242, and (3) tampering with a witness by planning the murder of Groves after she filed a complaint with the NOPD, in violation of 18 U.S.C. § 1512(a)(1)(c). *Causey*, 185 F.3d at 411. The Government sought the death penalty.

At trial, the jury heard from Davis's former partner, Williams, about the plan to murder Groves. Williams recounted the steps Davis took while on-duty and in their police cruiser to arrange for the murder. Williams also was with Davis for a number of wiretapped phone calls and was able to provide the jury with information about those calls. For instance, the Government asked Williams what it meant when Davis said, "I can get 'P' to come do that whore now and then we handle the 30." Williams explained that Davis was arranging for Paul Hardy ("P") to kill Kim Groves ("that whore") and that Williams and Davis would "write the [police] report whereby any evidence and any involvement with Paul Hardy would be eliminated"("handle the 30"). Williams also testified that Davis "started jumping up and down in joy" when he got confirmation over his police radio that Groves was murdered. Davis said, "Yeah, yeah, yeah, rock, rock-a-bye"—a reference to a movie where the assassin said "rock-a-bye-baby" every time she killed someone. The jury convicted Davis and recommended a death sentence. The district court imposed it.

No. 19-70010

### B.

On appeal, Davis challenged his §§ 241 and 242 convictions. *See Causey*, 185 F.3d at 411. Davis argued, *inter alia*, that the jury had insufficient evidence that he organized the murder of Groves while acting "under color of law." Under Supreme Court and Fifth Circuit precedent, the Government needed to prove beyond a reasonable doubt that (1) Davis "misused or abused his official power" and (2) "there is a nexus between the victim, the improper conduct[,] and Davis's performance of official duties." *Causey*, 185 F.3d at 415 (citing *West v. Atkins*, 487 U.S. 42, 50 (1988); *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 452 n.4 (5th Cir. 1994) (en banc)). The panel found that the Government proved Davis acted "under color of law":

> Davis misused or abused his official power to access the police station, the police car, and police radio to plan, execute, and cover up [Groves's] murder. The evidence of a nexus between that abuse and the crime is likewise sufficient. Davis's status as a police officer put him in the unique position to "handle the thirty" and thus offer protection to Hardy from the consequences of the murder. The motive for the crime arose from a complaint lodged by Groves against Davis in his official capacity[;] it was facilitated by the ability of Davis to case the area in his police car without arousing suspicion and to offer assurance of police protection to his accomplices.

*Id.* at 415–16.[2]

Although the panel upheld Davis's §§ 241 and 242 convictions, it vacated his conviction for witness tampering and remanded for resentencing.

---

[2] The text of 28 U.S.C. § 242 requires that the defendant act "under color of law," but the text of § 241 does not. Nevertheless, our court has construed § 241 to include a requirement that the defendant engage in "state action." *United States v. Tarpley*, 945 F.2d 806, 808 & n.2 (5th Cir. 1991). The appeal panel considered this requirement to be coextensive with § 242's "under color of law" requirement. *Causey*, 185 F.3d at 413–14.

After a subsequent appeal, *see United States v. Davis*, 380 F.3d 821, 829–30 (5th Cir. 2004), Davis's resentencing began in 2005. *See Davis*, 609 F.3d at 672. A jury once again recommended a death sentence. *Id.* at 672–73. On appeal from this death sentence, Davis argued yet again that "the evidence was insufficient to prove the 'color of law' element" for §§ 241 and 242. *Id.* at 697. But the panel declined to review his argument since Davis previously raised it on appeal. *Ibid.* After thoroughly reviewing his other arguments, the panel affirmed Davis's death sentence. *Id.* at 699.

Davis then challenged his conviction and sentence on numerous grounds in a § 2255 motion. He sought to proceed pro se. The district court granted Davis's request but appointed standby counsel. That generated *another* appeal over whether Davis's § 2255 motion should include 29 grounds (as standby counsel wanted) or only 19 grounds (as Davis wanted). We agreed with Davis. *See United States v. Davis*, 629 F. App'x 613, 618 (5th Cir. 2015) (per curiam). The district court then reviewed "the disorganized, duplicative[,] and redundant" arguments supporting Davis's 19 grounds in his 278-page motion, and the court denied them all. *United States v. Davis*, No. CR 94-381, 2018 WL 1419351, at *3 (E.D. La. Mar. 22, 2018). The district court further denied a COA.

Davis timely applied for a COA from this court.

## II.

Before a federal prisoner can seek appellate review of a district court's denial of his § 2255 motion, he must first "obtain a COA from a circuit justice or judge." *Buck v. Davis*, 137 S. Ct. 759, 773 (2017); *see* 28 U.S.C. § 2253(c)(1)(B). A COA is jurisdictional—"[a] Court of Appeals may not rule on the merits of [the prisoner's] case" until a COA has issued. *Buck*, 137 S. Ct. at 773; *see also Miller-El v. Cockrell*, 537 U.S. 322, 335–36 (2003). And

a COA may only issue if the prisoner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

To determine if a COA applicant has made that showing, we ask a "threshold question": has the applicant shown that "'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further'"? *Buck*, 137 S. Ct. at 773 (quoting *Miller-El*, 537 U.S. at 327). This is not a "full consideration of the factual or legal bases adduced in support of the claims." *Miller-El*, 537 U.S. at 336. Instead, we "ask 'only if the District Court's decision was debatable.'" *Buck*, 137 S. Ct. at 774 (quoting *Miller-El*, 537 U.S. at 327).

In his application, Davis raises three claims that he says demonstrate "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). We review each claim in turn. *See Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997) ("COAs are granted on an issue-by-issue basis.").

A.

First, Davis requests a COA on his claim that he was deprived "his constitutional right to the effective assistance of counsel at his 1996 guilt phase trial." *See Strickland v. Washington*, 466 U.S. 668, 686 (1984). The Court has said that "[t]he Sixth Amendment right to counsel 'is the right to the effective assistance of counsel.'" *Buck*, 137 S. Ct. at 775 (quoting *Strickland*, 466 U.S. at 686). To show the deprivation of effective counsel, a prisoner "must show both that counsel performed deficiently and that counsel's deficient performance caused him prejudice." *Ibid.* (quoting *Strickland*, 466 U.S. at 687). The district court found Davis's *Strickland* claim wanting because his "mere conclusions about [his] lawyer's performance [were] not enough to give rise to a credible assertion of a

6

deficiency," and because Davis "fail[ed] to demonstrate a level of prejudice that is required by the *Strickland* standard."

Davis argues that his counsel provided ineffective assistance by not "investigat[ing], litigat[ing], or argu[ing] the weaknesses of the 'under color of law' element." According to an affidavit prepared for the purpose of his § 2255 motion, Davis's trial counsel asserts that he should have done more investigating, and he had no "strategic reason" for not doing so. For instance, trial counsel asserts that if only he'd known that Davis had a pre-existing personal acquaintance with Groves, he would have used that to dispute the Government's theory that Davis killed Groves because of her police-brutality complaint. Davis also provides another affidavit from a private investigator, which asserts that Davis and Groves had "long-standing friction" and "personal hatred."

We need not decide whether Davis has made the requisite showing of his counsel's deficiency because no reasonable jurist could debate that Davis suffered no prejudice. *Buck*, 137 S. Ct. at 776. In order to show prejudice, there must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ibid.* (quoting *Strickland*, 466 U.S. at 694). "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). And when a court assesses prejudice, it "must consider the totality of the evidence before the judge or jury" because "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 695–96. Thus, the question for a COA is, in light of the totality of evidence, has Davis shown "a reasonable probability" that the result of his trial would have been different if his attorney had done more investigating into the "color of law" requirement and found Davis's personal history with Groves? *Buck*, 137 S. Ct. at 776.

The answer is plainly no. The evidence for the "under color of law" requirement was overwhelming. *See Strickland*, 466 U.S. at 696. Davis put his plan into action the day after learning of Groves's complaint with NOPD. *Causey*, 185 F.3d at 415. On the day of her murder and while on-duty, Davis "paged Hardy and Causey, discussed with them his plan to have Groves killed, met with them in the police station, then took them in his police car to show them the area that Groves frequented." *Ibid.* While cruising Groves's neighborhood later that night—on-duty and in his police car—he spotted her "and paged Hardy to give him Groves's location." *Ibid.* And Hardy went to go kill Groves with an assurance that Davis would take care of any evidence at the crime scene. *Ibid.* The jury heard this assurance through Davis's own voice in taped conversations and through Davis's partner's testimony. This was far more than enough to show Davis "used or abused his official power" and there was "a nexus between the victim, the improper conduct[,] and Davis's performance of official duties." *Causey*, 185 F.3d at 415.

Moreover, Davis fails to show what difference additional information about his relationship with Groves would make. For instance, the jury already heard testimony that Davis and Groves had known each other prior to the filing of the complaint that led to her death. ("Q: Did [Groves] actually name Len Davis by name [in the complaint]? A: Yes, she did. Q: Did she indicate that she had known him prior in some manner? A: Yes, she did."). And Davis does not show why that personal relationship would undermine his conviction given longstanding precedent that §§ 241 and 242 convictions can arise out of crimes committed for personal reasons. *See, e.g.*, *United States v. Tarpley*, 945 F.2d 806, 809 (5th Cir. 1991) (holding a "jealous husband" who beat up his wife's ex-lover still acted under color of law because he used his official status as a police officer to claim he could kill the other man, he summoned another police officer to join him in threatening the man, and the officers chased the man "out of town in their squad car"); *cf. Cooks v. United*

*States*, 461 F.2d 530, 532 (5th Cir. 1972) (holding that counsel is not "ineffective" for failing to "foresee future pronouncements which will dispossess the court of power to impose a particular sentence which is presently thought viable" under current precedent).

Instead of making that showing, Davis appears to relitigate the "under color of law" issues that he presented in his first appeal. That is not the role of federal postconviction review. "[A] collateral challenge may not do service for an appeal." *United States v. Shaid*, 937 F.2d 228, 231 (5th Cir. 1991) (en banc) (quotation omitted). And once a claim is raised and adjudicated on direct appeal, the prisoner cannot re-raise the claim under § 2255 absent a change in law. *See, e.g.*, *United States v. Kalish*, 780 F.2d 506, 508 (5th Cir. 1986). Davis's ineffective assistance of counsel claim is therefore not debatable.

## B.

Davis next requests a COA on his claim that his Sixth Amendment right to a jury trial was compromised by "the adverse impact of external influences and misconduct" during his 1996 guilt-phase trial. The district court considered this argument in conjunction with an argument that the jurors were biased. Ultimately, the district court determined that "these claims [were] without merit. . . . [I]t is worth remembering that in all respects there is overwhelming record evidence of [Davis's] guilt in a horrendous federal crime. There is no factual or constitutional basis warranting the relief [he] request[s]."[3]

---

[3] Davis argues that the district court applied the wrong standard in reviewing his claim about external influences on the jury. Even if the district court did apply the wrong standard, "§ 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'" *Miller-El*, 537 U.S. at 336. As a consequence, it is not enough for Davis to simply say the district court was wrong; Davis

The Supreme Court has held that the Sixth Amendment forbids "jurors from being subjected to 'private communication, contact, or tampering' and considers any such external influences presumptively prejudicial." *Oliver v. Quarterman*, 541 F.3d 329, 335 (5th Cir. 2008) (quoting *Remmer v. United States*, 347 U.S. 227, 229 (1954)). But Davis fails to point to any external influences in his COA briefing. For instance, Davis complains about the fact that his jury was sequestered during his trial. But Davis himself requested that sequestration. And, more to the point, Davis points to "absolutely no evidence" that even "suggests" that anyone "tried to talk to [the jurors] about the trial." *United States v. Fryar*, 867 F.2d 850, 853 (5th Cir. 1989) (denying "external influence" claim). Nor does he indicate that any of the officials charged with shepherding the sequestered jurors said anything inappropriate. *See Parker v. Gladden*, 385 U.S. 363, 363 (1966) (per curiam) (reversing conviction because "a court bailiff assigned to shepherd the sequestered jury . . . stated to one of the jurors in the presence of others . . . 'Oh that wicked fellow [defendant], he is guilty'").[4]

To the extent Davis relies on any evidence, that evidence reflects no external influence on the jury. He points to the declaration of a wife of a juror to describe her fear. But she wasn't on the jury, so her fears are irrelevant to Davis's jury-trial claim. *See Oliver*, 541 F.3d at 335 ("*Remmer* . . . prohibits *jurors* from being subjected to . . . external influences" (emphasis added)).

---

must show that under the right standard, "reasonable jurists" could debate the resolution of his claim. *Ibid.*

[4] In the district court, Davis made several arguments about several other alleged juror incidents, including one involving a juror's personal use of a Bible. But Davis did not raise those issues in his COA application before our court. He thus forfeited these arguments. *Hughes v. Johnson*, 191 F.3d 607, 613 (5th Cir. 1999) ("Issues not raised in the brief filed in support of [an applicant's] COA application are [forfeited]." (citing *Moawad v. Anderson*, 143 F.3d 942, 945 n.1 (5th Cir. 1998))); *Perillo v. Johnson*, 79 F.3d 441, 443 n.1 (5th Cir. 1996).

Davis then says one juror was dozing off during the trial and played with a "little gambling machine toy" to stay awake. But the Supreme Court has explained that there is a difference between external influence claims and so-called internal influence claims. *See Tanner v. United States*, 483 U.S. 107, 117 (1987). "[I]nternal influences . . . provide no basis for relief," and these "include allegations of physical or mental incompetence of a juror, such as claims that a juror was insane, could not sufficiently understand English, or had a severe hearing impairment." *Oliver*, 541 F.3d at 336 (citing *Tanner*, 483 U.S. at 119). Under the Supreme Court's framework, a dozing or game-playing juror is under a purely *internal* influence. And that's not a cognizable constitutional claim, *ibid.*, much less is it a debatable one.

## C.

The last constitutional claim for which Davis seeks a COA is that the Government withheld key evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The district court denied these claims because they had "no evidentiary basis and are merely Davis' conclusions and speculation." Jurists of reason could not debate that result.

"To establish a due process violation under *Brady*, a habeas petitioner must satisfy three elements." *In re Raby*, 925 F.3d 749, 759–60 (5th Cir. 2019) (citing *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)). "First, the evidence suppressed must be favorable to the defendant." *Id.* at 760. "Second, the [Government] must have suppressed the evidence," either willfully or inadvertently. *Ibid.* "Third, prejudice must have ensued—*i.e.*, the suppressed evidence must have been material." *Ibid.* (quotation omitted). For evidence to be material, Davis must show "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). For instance, a *Brady* violation occurs when "the favorable

evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

Davis argues the Government violated these standards in two ways. First, he argues that the FBI did not disclose the results of an internal investigation into Davis's wiretaps. The FBI conducted an internal investigation to determine why FBI officials, who were listening to Davis's calls while he planned Groves's murder, did not intervene to stop that murder. The investigation concluded that "based on Davis's historical language, involvement with [NOPD] complaints, personal references, abusive language[,] and use of the phone to conduct police business, Davis's activity . . . could be mistaken as routine." Thus, the FBI concluded it was understandable that the officials missed the significance of the calls at first.

Even if Davis showed that this evidence met the first two *Brady* elements, reasonable jurists could not debate the immateriality of this evidence. As the Government argued below, "[t]his report addressed why the [FBI] monitor did not catch the calls; it did not evaluate the quality of the evidence" or the meaning of the words that Davis actually used. And Davis makes no showing that this evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435; *see also Giglio v. United States*, 405 U.S. 150, 154 (1972) ("We do not, however, automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict." (quotation omitted)). After all, Sammie Williams heard the conversations firsthand and provided the jury with significant evidence about what Davis meant: he wanted Groves dead.

Second, Davis argues that the Government violated *Brady* by failing to fully disclose "302s." *See also Giglio*, 405 U.S. at 154. The term "302" refers to an FBI form bearing that number, which serves as an "official interview memorand[um]." *United States v. Cessa*, 861 F.3d 121, 128 (5th Cir. 2017). The FBI prepared these memoranda after talking with Williams. The Government provided Davis's trial counsel with redacted 302s for the trial. But during his postconviction proceedings at the district court, Davis obtained unredacted versions of the 302s. Davis now claims that the redactions violated *Brady* and *Giglio*.

Davis fails to make any showing that any particular part of these 302s would have impeached Williams or proved exculpatory in any way. *See United States v. Dillman*, 15 F.3d 384, 390 (5th Cir. 1994) ("Although exculpatory and impeachment evidence fall within the purview of *Brady*, neutral evidence does not."). Moreover, Davis fails to make any showing of materiality. He points to no specific redactions that if disclosed to the defense would have led to a different result in his trial. *See Bagley*, 473 U.S. at 682. For instance, Davis points to nothing that would have been vital to cross-examination, *see United States v. Sipe*, 388 F.3d 471, 483 (5th Cir. 2004), would have further developed "avenue[s] of impeachment," *ibid.*, or would have undermined any of the corroboration of Williams's account that the wiretapped conversations themselves provided, *see Cessa*, 861 F.3d at 129–30; *Rocha v. Thaler*, 619 F.3d 387, 396–97 (5th Cir. 2010) ("[T]he impeached testimony of a witness whose account is strongly corroborated by additional evidence supporting a guilty verdict . . . generally is not found to be material." (quotation omitted)). Davis's *Brady* claims are therefore not debatable.

Davis's application for a COA is DENIED.

### III.

The district court also denied Davis's request for an evidentiary hearing. And Davis seeks a COA on that issue as well. But we have no power to issue such COAs. Congress specified that we can issue a COA "only if the applicant has made a substantial showing of the denial of a *constitutional* right." 28 U.S.C. § 2253(c)(2) (emphasis added). The denial of a *statutory* claim for an evidentiary hearing under § 2254(e)(2) obviously does not itself implicate a constitutional right.

That's why we have held that "a petition challenging an evidentiary ruling may only be entertained as *corollary* to a constitutional violation." *Norman v. Stephens*, 817 F.3d 226, 234 (5th Cir. 2016) (quotation omitted; emphasis added). To that end, a request for an evidentiary hearing stands or falls with the applicant's COA showing. *See ibid.*

When a prisoner has identified a substantial and reasonably debatable constitutional claim, we can issue a COA on that question. *See* 28 U.S.C. § 2253(c). The issuance of that COA is a matter of jurisdictional significance. *See Miller-El*, 537 U.S. at 336 (noting a COA "is a jurisdictional prerequisite"). It allows the prisoner to appeal. It allows us to consider the prisoner's arguments on the "specific issue or issues" that we've indicated in the COA. 28 U.S.C. § 2253(c)(3); *see Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997) (holding "our review of [the prisoner's] habeas petition is limited to the issue specified in the COA"). And we've held the issuance of a COA on a constitutional claim gives us the correlative power to consider the prisoner's statutory claim to an evidentiary hearing. *See, e.g.*, *United States v. Reed*, 719 F.3d 369, 371 (5th Cir. 2013); *United States v. Cavitt*, 550 F.3d 430, 442 (5th Cir. 2008); *United States v. Edwards*, 442 F.3d 258, 264 (5th Cir. 2006); *United States v. Cervantes*, 132 F.3d 1106, 1110 (5th Cir.

1998); *United States v. McMillen*, 96 F. App'x 219, 221 (5th Cir. 2004) (per curiam).

By contrast, when the prisoner has not identified a substantial and reasonably debatable constitutional question, we cannot issue a COA. *See* 28 U.S.C. § 2253(c)(2). And because a COA is a jurisdictional prerequisite to any appeal, *see Miller-El*, 537 U.S. at 336, we have no judicial power to do anything without it. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("'Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.'" (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868))). That's why we've held that when an applicant's "constitutional claims fail" to make the necessary showing for a COA, "we do not address the merits of [the] request for an evidentiary hearing." *Norman*, 817 F.3d at 234. We do not address those merits because, without a COA, we have no jurisdiction to do so. *See, e.g.*, *Alix v. Quarterman*, 309 F. App'x 875, 878 (5th Cir. 2009) (per curiam); *Lewis v. Quarterman*, 272 F. App'x 347, 351 (5th Cir. 2008) (per curiam) (deferring consideration of evidentiary hearing question, if and when "the merits are addressed in a subsequent opinion"); *McMillen*, 96 F. App'x at 221.[5]

---

[5] *Norman* also noted that, because Congress did not give us the power to grant COAs on statutory claims for evidentiary hearings, "[w]e . . . construe Norman's request for a COA on this issue as a direct appeal from the denial of an evidentiary hearing." 817 F.3d at 234. But the fact that Norman *attempted* to appeal directly from the denial of an evidentiary hearing does not mean that Norman *could* so appeal. Litigants of all kinds (including but not limited to prisoners) attempt to appeal from all sorts of things, even when they cannot. *See, e.g.*, *Lawson v. Stephens*, 900 F.3d 715, 719 (5th Cir. 2018) (holding a notice of appeal from a magistrate judge's decision is "a nullity"). That's why *Norman* did not "affirm" or "reverse" or otherwise exercise any jurisdiction whatsoever over the prisoner's request for an evidentiary hearing. The *Norman* panel simply denied the COA.

No. 19-70010

Because Davis has not made the requisite showing for the granting of a COA on his constitutional claims, we cannot issue a COA. And because we cannot issue a COA, we have no power to say anything about his request for an evidentiary hearing. *See Norman*, 817 F.3d at 234.

SO ORDERED.

**Certified as a true copy and issued
as the mandate on Aug 21, 2020**

**Attest:**

**Clerk, U.S. Court of Appeals, Fifth Circuit**

16