**IN THE**

**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

---

**NO. 19-70010**

---

**UNITED STATES OF AMERICA**,

Plaintiff-Appellee,

**VERSUS**

**LEN DAVIS,**

Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA, Nos. 2:12-CV-752
and 2:94-CR-381-1

_____

**PETITION FOR REHEARING EN BANC ON BEHALF OF
APPELLANT LEN DAVIS**

_____

SARAH L. OTTINGER
La. Bar No. 24589
Second Floor
2563 Bayou Road
New Orleans, LA 70119
Phone: 504-258-6537
Email: sottinger1010@gmail.com

REBECCA L. HUDSMITH, La. Bar No. 7052
Office of the Federal Public Defender
Western & Middle Districts of Louisiana
102 Versailles Blvd., Suite 816
Lafayette, Louisiana 70501
Phone: 337-262-6336
Facsimile: 337-262-6605
Email: Rebecca_Hudsmith@fd.org

**IN THE**

**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

**NO. 19-70010**

**UNITED STATES OF AMERICA,**

Plaintiff-Appellee,

**VERSUS**

**LEN DAVIS,**

Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA, Nos. 2:12-CV-752
And 2:94-CR-381-1

**PETITION FOR REHEARING EN BANC ON BEHALF OF
APPELLANT LEN DAVIS**

**CERTIFICATE OF INTERESTED PERSONS**

The undersigned counsel of record certifies that the following listed persons

have an interest in the outcome of these proceedings.  These representations are

i

made in order that the Judges of this court may evaluate possible disqualification or recusal.

Appellant:

Len Davis.

Attorneys for Appellant:

Rebecca L. Hudsmith, Federal Public Defender
Middle and Western Districts of Louisiana
102 Versailles Blvd., Suite 816
Lafayette, LA 70501

Sarah L. Ottinger
Second Floor
2563 Bayou Road
New Orleans, LA 70119

Appellee:

United States of America.

Attorneys for Appellee:

Michael Edward McMahon (in the district court)
Tracey Nicole Knight
Kevin G. Boitmann
Diane Hollenshead Copes
U.S. Attorney's Office for the Eastern District of Louisiana
Suite 1600
650 Poydras Street
New Orleans, LA 70130

Suzanne Drouet
U.S. Department of Justice
Room 7627
10th & Pennsylvania Avenue, N.W.
Washington, D.C. 20530

Lafayette, Louisiana this 5th day of October, 2020.

/s/ Rebecca L. Hudsmith
Rebecca L. Hudsmith, La. Bar No. 7052
Federal Public Defender
Middle and Western Districts of Louisiana
102 Versailles Blvd., Suite 816
Lafayette, Louisiana 70501
Telephone: 337-262-6336
Facsimile: 337-262-6605

**TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTERESTED PERSONS ..................................................... i

TABLE OF CONTENTS ............................................................................. iv

TABLE OF AUTHORITIES .......................................................................... v

F.R.A.P. 35(b)(1) STATEMENT BY COUNSEL .................................................. 1

STATEMENT OF JURISDICTION ................................................................. 2

ISSUES THAT MERIT EN BANC CONSIDERATION ...................................... 2

COURSE OF PROCEEDINGS AND DISPOSITION OF THE CASE ............... 3

STATEMENT OF FACTS ......................................................................... 6

ARGUMENT AND AUTHORITIES ............................................................. 9

    **I.**     **REHEARING EN BANC SHOULD BE GRANTED TO CORRECT THE PANEL'S ERRONEOUS DENIAL OF A COA FOR DAVIS'S CONSTITUTIONAL CLAIMS, AFTER DECIDING THE MERITS OF EACH CLAIM, AND ITS ERRONEOUS REFUSAL TO ADDRESS THE ISSUE OF THE DISTRICT COURT'S DENIAL OF AN EVIDENTIARY HEARING ON THOSE CLAIMS ........... 9**

    **II.**     **REHEARING EN BANC SHOULD BE GRANTED TO CORRECT THE PANEL'S ERRONEOUS ANALYSIS OF DAVIS'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM ........ 14**

CONCLUSION ...................................................................... 17

CERTIFICATE OF SERVICE ..................................................... 19

CERTIFICATE OF COMPLIANCE WITH RULE 35(b)(2)(A). ............... 20

# TABLE OF AUTHORITIES

**CASES**                                                                **Page**

*Brady v. Maryland*, 373 U.S. 83 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Buck v. Davis*, 137 S.Ct. 759 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . .1, 10, 12

*Davis v. United States*, 530 U.S. 1277 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Kyles v. Whitley*, 514 U.S. 419 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Massaro v. United States*, 538 U.S. 500 (2003) . . . . . . . . . . . . . . . . . . . .1, 13

*Miller-El v. Cockrell*, 537 U.S. 322 (2003). . . . . . . . . . . . . . . . . . . . . .1, 10, 15

*Norman v. Stephens*, 817 F.3d 226 (5th Cir. 2016). . . . . . . . . . . . . . . . . . . 13

*Screws v. United States*, 325 U.S. 91 (1945). . . . . . . . . . . . . . . . . . . . . . .1, 16

*Shields v. United States*, 698 Fed.Appx. 807 (6th Cir. 2017) . . . . . . . . . . . . . . . . 15

*Strickland v. Washington*, 466 U.S. 668 (1984). . . . . . . . . . . . . . . . . . . . . 1, 10, 14-15

*United States v. Causey*, 185 F.3d 407 (5th Cir. 1999) . . . . . . . . . . . . . . . . 3, 15-16

*United States v. Classic*, 313 U.S. 299 (1941). . . . . . . . . . . . . . . . . . . .1, 15-16

*United States v. Davis*, 971 F.3d 524 (5th Cir. 2020). . . . . . . . . . . . . . . .5, 11-13, 16

*United States v. Davis*, 609 F.3d 663 (5th Cir. 2010), *cert. denied sub nom Davis v. United States,* 131 S.Ct. 1676 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Price*, 383 U.S. 787 (1966). . . . . . . . . . . . . . . . . . . . . . . . . 1, 16

*United States v. Reed*, 719 F.3d 369 (5th Cir. 2013). . . . . . . . . . . . . . . . . . . . . 1, 13

*United States v. Tarpley*, 945 F.2d 805 (5th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . .16

## STATUTES AND OTHER AUTHORITIES

F.R.App.P. Rule 4(a)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

18 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 14

18 U.S.C. § 242. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3, 14

18 U.S.C. § 1512(a)(1)(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. § 2253(c)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

28 U.S.C. § 2253(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

28 U.S.C. § 2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 9, 13

## F.R.A.P. 35(b)(1) STATEMENT OF COUNSEL

I express a belief, based on a reasoned and studied professional judgment, that the panel decision is contrary to the following decisions of the United States Court of Appeals for the Fifth Circuit and of the Supreme Court of the United States, and that consideration by the full court is necessary to secure and maintain uniformity of decisions in this court:

*Buck v. Davis*, 137 S.Ct. 759 (2017)
*Miller-El v. Cockrell*, 537 U.S. 322 (2003)
*Strickland v. Washington*, 466 U.S. 668 (1984)
*Kyles v. Whitley*, 514 U.S. 419 (1994)
*Massaro v. United States*, 538 U.S. 500 (2003)
*United States v. Reed*, 719 F.3d 369 (5th Cir. 2013)
*United States v. Classic*, 313 U.S. 299 (1941)
*Screws v. United States*, 325 U.S. 91 (1945)
*United States v. Price*, 383 U.S. 787 (1966)

Lafayette, Louisiana, this 5th day of October, 2020.

/s/ Rebecca L. Hudsmith
Rebecca L. Hudsmith

1

NOW INTO COURT, through undersigned counsel, comes the appellant, LEN DAVIS, who hereby submits this petition for rehearing en banc.

## STATEMENT OF JURISDICTION

The district court denied Davis's motion to vacate under 28 U.S.C. § 2255, ROA.7135, issued a judgment denying relief, ROA.7148, and an order denying a Certificate of Appealability ("COA"). ROA.7150.

Davis filed a timely motion to alter or amend judgment, which the district court denied. ROA.7151; ROA.7193. Davis filed a timely notice of appeal under F.R.App.P. Rule 4(a)(1)(B).

Pursuant to 28 U.S.C. § 1291, this Court has jurisdiction.

## STATEMENT OF ISSUES THAT MERIT EN BANC CONSIDERATION

Whether the Panel erred in denying a COA for Davis's constitutional claims by deciding the merits of each claim and then refusing to address the issue of the district court's erroneous denial of an evidentiary hearing on the claims, in conflict with Supreme Court and Fifth Circuit precedent?

Whether the Panel erred in denying a COA for Davis's constitutional claim of ineffective assistance of trial counsel by applying the wrong standard for prejudice and finding the claim not "debatable," in conflict with Supreme Court precedent?

## COURSE OF PROCEEDINGS AND DISPOSITION OF THE CASE

Appellant Len Davis, an African-American former officer with the New Orleans Police Department ("NOPD"), was charged in December of 1994, along with civilians Paul Hardy and Damon Causey, with a conspiracy to deprive Kim Marie Groves of her civil rights, resulting in her death, in violation of 18 U.S.C. § 241, and with the substantive violation of Groves's civil rights while acting under color of the laws of the State of Louisiana by shooting her, resulting in her death, in violation of 18 U.S.C. §§ 242 and 2. (Counts 1 and 2). ROA.815. Count 3 charged all three with killing Groves as a witness, in violation of 18 U.S.C. §§ 1512(a)(1)(c) and 2. ROA.818. On July 31, 1995, the Government filed Notices of Intent to Seek the Death Penalty against Davis and Hardy. ROA.797; ROA.799. Davis was convicted and sentenced to death in April of 1996. ROA.2274.

On appeal, this Court affirmed Davis's convictions as to Counts 1 and 2, with a dissent, and reversed his conviction as to Count 3 for insufficient evidence, and vacated Davis's death sentences on Counts 1 and 2 and remanded for a new sentencing hearing. *United States v. Causey*, 185 F.3d 407, 422-23 (5th Cir. 1999). The United States Supreme Court denied certiorari review. *Davis v. United States*, 530 U.S. 1277 (2000).

On August 5, 2005, Davis was once again sentenced to death on Counts 1 and 2. ROA.5498 (jury verdict); ROA.5170 (judgment). On appeal, the judgment and sentences of death were affirmed, and the Supreme Court denied certiorari review. ROA.2165; *United States v. Davis*, 609 F.3d 663 (5th Cir. 2010), *cert. denied sub nom Davis v. United States,* 131 S.Ct. 1676 (2011).

Davis filed a timely motion under 28 U.S.C. § 2255 for relief from his 1996 convictions on Counts 1 and 2, alleging numerous constitutional claims challenging the convictions. ROA.5498. The district court originally indicated it would order an evidentiary hearing on at least some of these claims. *See* ROA.6911, ROA.6925 and ROA.14448.

Davis filed a memorandum in support of granting an evidentiary hearing on his claims concerning ineffective assistance of counsel in the 1996 trial, as well as *Brady/Giglio* violations, juror bias, and the Government's conflict of interest in connection with the 1996 trial. ROA.7050. In support, Davis submitted an affidavit of 1996 trial counsel Dwight Doskey, ROA.7069, declarations of jurors in the 1996 trial, ROA.7091, and Government star witness Sammie Williams's un-redacted FBI 302's, ROA.7072, which were provided to Davis by the Government for the first time in 2017.

Despite its earlier indication, the district court issued an order denying an evidentiary hearing on any claims and ordering that all claims be dismissed. ROA.7135. The district court, citing to an appellate standard of review, erroneously found that Davis presented "no new facts or evidence" in support of his "conclusory claims." ROA.7136. The district court made no mention of the Doskey affidavit, the juror declarations or the previously undisclosed un-redacted Sammie Williams FBI 302s.

Davis filed a timely motion to alter or amend the judgment denying relief without a hearing. ROA.7151. Davis attached an additional affidavit of investigator Bruce Johnson concerning his investigation of the "under color of law" element, including the nature and extent of the relationship long-existing between Davis and Groves. ROA.7183. In dismissing the motion, the district court concluded again that Davis's arguments of "ineffective assistance of counsel are mere conclusions not supported by the record or the law." ROA.7193; ROA.7197. The district court again failed to note the affidavits or other additional evidence in support. Davis filed a timely notice of appeal. ROA.7200.

On August 21, 2020, a panel of this Court denied the application for a COA filed by Davis. *United States v. Davis*, 971 F.3d 524 (5th Cir. 2020) (attached).

## STATEMENT OF FACTS

Beginning in early 1994, Davis became partners with NOPD patrolman Sammie Williams. ROA.9770-9772; ROA.9774. Williams was already participating in what was an FBI sting operation, Operation Shattered Shield, overseen by AUSA Michael McMahon, investigating corruption in the NOPD. ROA.14195. Davis was drawn into the sting operation as well in April of 1994. ROA.14203.

The FBI wiretapped a cell phone given to Davis beginning in September of 1994 and continuing into December of 1994. ROA.14285-14286. Trained monitors listened to the calls and recorded notes on daily phone logs, which were reviewed by an FBI agent the next day. ROA.889-891. Much of the evidence presented at the 1996 guilt phase death penalty trial included these wiretap recordings and the interpretation of those recordings by Davis's ex-partner, Sammie Williams. [1]

---

[1] If Williams's interpretation of the wiretaps is correct, the FBI listened to the planning of a murder and did nothing to stop it, giving rise to the U.S. Attorney Office's conflict in prosecuting Davis for the shooting—a claim asserted in Davis's § 2255 Motion. ROA.6300-6312. AUSA McMahon oversaw Operation Shattered Shield and inserted himself as a witness in habeas proceedings, essentially "testifying" to what occurred during the investigation while denying his and his office's conflict of interest. ROA.6696-6706. This Court recently overturned a conviction based on the similar misconduct by McMahon, which it found "overwhelming" in "magnitude." *See United States v. Beaulieu*, No. 19-30609 (5th Cir. 8/31/2020) at 11.

At trial, it was the Government's theory that wiretapped conversations of Davis occurring on October 13, 1994, the date of Groves's shooting death, were evidence of a murder ordered by Davis to be committed by Hardy as a result of Groves's filing a brutality complaint against Davis with the Internal Affairs Division (IAD) of NOPD.  Sammie Williams testified for the Government in support of this theory, explaining that on the morning of October 13, 1994, Davis informed him that he, Davis, had heard that Groves had filed an IAD complaint against Davis for beating up her nephew. ROA.9791. In fact, Williams hit the nephew in the back of the head during a foot chase on October 11, 1994. ROA.9790-9791.  Williams told Davis that if IAD did investigate the complaint, it would be unfounded on Davis's part since he did not hit the nephew, "so there was nothing for him to worry about." ROA.9797-9798.

When Williams started his shift with Davis later in the day on October 13, 1994, at 2:25 p.m., Davis started talking about how angry he was at Groves for having reported him to IAD. ROA.9960-9961. Around 5:00 p.m., Williams and Davis were stopped at a red light in their police vehicle when they noticed Groves in the back seat of a vehicle that had "pulled up right on the side" of them. ROA.9961-9962. As they noticed each other, "Kim started pointing from the back of her car into our car saying – we would read her lips saying, 'That's them.  That's

7

them.'" ROA.9962. Davis pointed back at Groves saying "I see you, too. I see you, too," and she then said some things they could not understand and the two vehicles turned in different directions. ROA.9962. According to Williams, at this point Davis "was real angry" and said he was going to kill Groves, stating "I could get Paul to do that whore and we could handle the 30." ROA.9962. Williams testified that this meant that Davis could get "Paul Hardy to come kill her and we will handle the police report, meaning that we will write the report whereby any evidence or any involvement with Paul Hardy would be eliminated." ROA.9963-9963.[2]

Williams testified that Hardy, Causey and two others arrived at the police station around 7:00 p.m. that evening because Davis wanted to show them gruesome pictures from an unrelated murder. ROA.9967; ROA.9970-9971. Later in the evening, Williams and Davis drove around in their police car to see if they could locate Groves, but did not find her. ROA.9974. Later, they drove back to the same area with Hardy let him know what Groves looked like and "so Paul could be familiar with the area that she frequents; because we didn't know exactly where she lived or anything like that, but we knew where we saw her at a lot." ROA.9976. They did not find her and dropped off Hardy by around 8:00 p.m. ROA.9977-9978.

---

[2]From his arrest, Mr. Davis has asserted his innocence, stating that his conversations with Williams referred to planting drugs on Groves and having her arrested.

Williams testified that he and Davis drove back to the area at 9:50 p.m. and saw Groves standing in the middle of the street, at which point, Davis beeped Hardy, saying "he doesn't want Kim Groves to see us passing in a police vehicle." ROA.9980-9981. When Hardy called to return the beep, Davis described what Groves was wearing and where she was standing. ROA.9981.

At about 11:20 p.m., after getting off his shift, Williams was in his personal vehicle when he received a call from Davis, who was also off-duty, saying "Signal 30, NAT," meaning "necessary action taken." ROA.9983-9984. Williams met Davis at a bar, at which time Davis had his cell phone in one hand and his police handheld radio in the other and was talking to Gary Washington, a police officer assigned to the Fifth District, who happened to be the first officer on the scene of the murder and who confirmed that Groves had been killed. ROA.9988-9990.

## ARGUMENT AND AUTHORITIES

I. **REHEARING EN BANC SHOULD BE GRANTED TO CORRECT THE PANEL'S ERRONEOUS DENIAL OF A COA FOR DAVIS'S CONSTITUTIONAL CLAIMS, AFTER DECIDING THE MERITS OF EACH CLAIM, AND ITS ERRONEOUS REFUSAL TO ADDRESS THE ISSUE OF THE DISTRICT COURT'S DENIAL OF AN EVIDENTIARY HEARING ON THOSE CLAIMS**

A petitioner is required to seek a certificate of appealability ("COA") before an appeal of the district court's denial of his 28 U.S.C. § 2255 habeas petition, 28

U.S.C. § 2253(c)(1)(B).  A COA "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  A petitioner satisfies this COA standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurist could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

In *Buck v. Davis*, 137 S.Ct. 759, 773 (2017), the Supreme Court, in reversing the Fifth Circuit, emphasized that the COA inquiry "is not coextensive with a merits analysis" and that a decision on the "jurists of reason" question should be made *without* full consideration of the factual or legal bases adduced in support of the claim.  In *Buck*, the Supreme Court recognized that the court below "phrased its determination in proper terms, but "it reached that conclusion only after essentially deciding the case on the merits."  *Id.*

Similarly, in the present case, the Panel, while using language of *Miller-El* and *Buck* in denying a COA to appeal Davis's constitutional claims as not "debatable," in fact, reached its conclusions on each claim only after deciding each on the merits, in direct conflict with *Buck*.  Thus, with respect to Davis's Sixth Amendment claim of ineffective assistance of his 1996 trial counsel, the Panel concluded, erroneously, that Davis had not shown prejudice under *Strickland v.*

10

*Washington*, 466 U.S. 668 (1984), since, based on "the totality of the evidence," he had not shown a reasonable probability" that the result of his trial would have been different if his trial attorney "had done more investigating" into the "color of law" requirement under Sections 241 and 242. *Davis,* 971 F.3d at 531. Likewise, the Panel, again erroneously, concluded with regard to Davis's Sixth Amendment claim that his right to a jury trial was compromised by "the adverse impact of external influences and misconduct" during his 1996 guilt-phase trial, that Davis failed to point to any evidence that reflected external influences on the jury and, to the extent he provided evidence of purely internal influences, it is "not a cognizable constitutional claim." *Id.* at 532-33.

The Panel similarly erroneously decided the merits of Davis's claims of violation of his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963). With respect to his *Brady* claim, based on the Government's withholding key evidence regarding its internal investigation to determine why FBI officials, who were listening to Davis's wiretapped calls, did not intervene to stop Groves's murder, the Panel concluded that the claim failed because the Government's internal investigation did not evaluate the quality of the evidence or the meaning of the words Davis used, and Davis did not establish prejudice, that is, he made no showing that the evidence could reasonably be taken to put the whole case in such a different light

11

as to undermine confidence in the verdict, again deciding the merits. *Id.* at 533. As for the second *Brady* claim based on the failure of the Government to produce un-redacted FBI 302s of interviews with Sammie Williams, the Panel likewise ruled on the merits, finding that Davis failed to make any showing of materiality of the evidence or how it would have been vital to cross-examination or impeachment of Williams, whose account was corroborated by "the wiretapped conversations themselves." *Id.* at 534.

As the Supreme Court made clear in *Buck*, whether Davis established prejudice or materiality regarding his constitutional claims are issues addressing the "ultimate merits determinations the panel should not have reached." *Buck*, 137 S.Ct. at 774. As the Supreme Court stated: "[t]hat a prisoner has failed to make the ultimate showing that his claim is meritorious does not logically mean that he failed to make a preliminary showing that his claim was debatable." *Id.* Thus, when a reviewing court, like the Panel here, inverts the statutory order of operations and first decides the merits of the appeal, and then justifies its denial of a COA based on its adjudication of the merits, "it has placed too heavy a burden on the prisoner *at the COA stage.*" *Id.* (emphasis in original).

The error of the Panel's approach is further evidenced by its flawed analysis of the district court's erroneous denial of an evidentiary hearing on Davis's

constitutional claims.  After concluding that these claims have no merit and are "not debatable," the Panel then concluded that it could not address the issue raised by Davis with respect to each constitutional claim:  the district court's abuse of discretion in denying an evidentiary hearing on these claims despite affidavits making specific factual statements in support based on personal knowledge. According to the Panel, since it concluded that Davis was not entitled to a COA on any of his constitutional claims, it could not address the merits of Davis's request for an evidentiary hearing because it did not have jurisdiction to do so.  *Id.* at 534-35.  The Panel reached this conclusion on the basis of court opinions that are not controlling of the issue.  *See, e.g., Norman v. Stephens*, 817 F.3d 226, 234 (5th Cir. 2016) (a Section 2254 proceeding arising from a state court conviction and raising very different considerations as a result of deference to the state courts).

This result is not only in conflict with *Miller-El* and *Buck*, but also with opinions of this Circuit reversing the denial of an evidentiary hearing in the Section 2255 context. *See United States v. Reed,* 719 F.3d 369, 373-74 (5th Cir. 2013).  *See also Massaro v. United States*, 538 U.S.  500, 505 (2003) (in a Section 2255 proceeding alleging ineffective assistance of trial counsel, Supreme Court recognizes that such claims should be litigated in the district court, "the forum best suited to developing

13

the facts necessary to determining the adequacy of representation during an entire trial").

## II.    REHEARING EN BANC SHOULD BE GRANTED TO CORRECT THE PANEL'S ERRONEOUS ANALYSIS OF DAVIS'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

Davis was indicted for a death-eligible offense involving the violation of Groves's civil rights "under color of law," an essential element for conviction under 18 U.S.C. §§ 241 and 242.  Despite the critical nature of this element, trial counsel for Davis did not investigate or litigate the weaknesses of the Government's case in support of the element. To the contrary, trial counsel's undisputed affidavit states that there was no discussion or consideration of addressing under color of law in pretrial motions or through investigation, and there was no strategic decision made not to do so.  ROA.7069.  Only when trial counsel moved for a judgment of acquittal based on insufficiency of the evidence was the element of under color of law mentioned.  ROA.2160.  The district court ruled: "I'm bothered by the color of law issue but I will deny the motion."  ROA.10341.

As set forth above, the Panel improperly addressed the merits of the prejudice prong of the *Strickland* analysis in denying a COA, and, in doing so, also applied the incorrect prejudice standard ("a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different,"

*Strickland*, 466 U.S. 668 at 694, *compared to* "the evidence for the 'under color of law' requirement was overwhelming," Slip Op. at 8). The Panel's conclusion that the claim was "not debatable," not only violated these standards, but is also wrong under the circumstances of this case. In addition to the district court's statement that the sufficiency of the evidence in support of the under color of law element was "troubling," Judge DeMoss concluded in his dissent on direct appeal that the Government's theory that the defendants, a rogue police officer, a drug dealer and the drug dealer's sidekick, were engaged in state action under color of state law was "nothing short of ridiculous." *United States v. Causey*, 185 F.3d 407, 425 (5th Cir. 1999), DeMoss, C.J., dissenting.

Thus, the Panel also erred in failing to issue a COA on Davis's ineffective assistance of counsel claim on the basis that Judge DeMoss's dissent on the issue of the insufficiency of the evidence to support the under color of law element itself evidences that "jurists of reason" would disagree. *Miller-El*, 537 U.S. at 327. *Accord: Shields v. United States*, No. 15-5609 (6th Cir. Nov. 4, 2015, Order, ECF No. 8 at 2 (granting COA on ineffectiveness due to dissent on direct appeal on related issue) (attached).

Moreover, the Panel erred in its application of the law governing the under color of law element. On direct appeal, this Court, citing to *United States v. Classic*,

15

313 U.S. 299 (1941); *Screws v. United States*, 325 U.S. 91 (1945), and *United States v. Price*, 383 U.S. 787 (1966), recognized that, in addressing the sufficiency of "under color of law," it must determine (1) whether Davis misused or abused his official power, and (2) whether there is a nexus between the victim, the improper conduct and Davis's performance of official duties. *Id.* at 415. The majority concluded that the evidence was sufficient to support not only misuse but also nexus because "[t]he *motive* for the crime arose from a complaint lodged by Groves against Davis in his official capacity, it was facilitated by the ability of Davis to case the area in his police car without arousing suspicion and to offer assurance of police protection to his accomplices." *United States v. Causey*, 185 F.3d at 415-416 (emphasis added).

The Panel erroneously concluded that evidence of what it called simply "a personal relationship" between Davis and Groves, which trial counsel failed to discover, would not have undermined the conviction, citing to *United States v. Tarpley*, 945 F.2d 806, 809 (5th Cir. 1991) (deputy was found to have acted under color of law when, out of personal jealousy, he assaulted his wife's former lover with the help of another officer and the two ran him out of town in their squad car, and an "air of official authority pervaded the entire incident"). 971 F.3d at 531. The uncontroverted evidence submitted by Davis established not just that Davis and

Groves knew each other, but that they knew each other for years before Davis was a police officer, had a personal relationship at one time and, since the dissolution of the relationship, there was long-standing friction and animosity between the two. ROA.7183. Had trial counsel discovered this, he could have countered the Government's theory, and the majority's basis for affirmance of the conviction, in support of the requisite nexus between victim/improper conduct/official duties, with evidence that any motive Davis may have had for the crime was based on his anger towards Groves for filing what she knew was an unfounded IAD complaint due to their long-standing personal animosity and not because of his performance of his official duties. In essence, this was a purely private dispute and, unlike in *Tarply*, an "air of official authority" did not "pervade[] the entire incident." The Panel's conclusion to the contrary is in conflict with the *Classic/Screws/Price* trilogy of cases.

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, appellant LEN DAVIS respectfully prays that this Court grant this petition for rehearing en banc, reverse the panel majority, and grant a certificate of appealability so that this Court can address the merits of Davis's constitutional claims and review the district court's

denial of relief or, in the alternative, remand the case to the district court for further proceedings.

RESPECTFULLY SUBMITTED,


s/ Rebecca L. Hudsmith
REBECCA L. HUDSMITH, La. Bar No. 7052
Federal Public Defender for the
Middle and Western Districts of Louisiana
102 Versailles Blvd., Suite 816
Lafayette, Louisiana 70501
Telephone: (337) 262-6336
Facsimile: (337) 262-6605
Email:  Rebecca_Hudsmith@fd.org



/s/ Sarah L. Ottinger
Sarah L. Ottinger, La. Bar No. 24589
2563 Bayou Road, Second Floor
New Orleans, LA 70119
Telephone:  (504) 258-6537
Email: sottinger1010@gmail.com

ATTORNEYS FOR LEN DAVIS

18

## CERTIFICATE OF SERVICE

I hereby certify that one copy of the above and foregoing has been served via ECF/electronic filing on counsel of record for respondent, on this 5th day of October, 2020.

s/ Rebecca L. Hudsmith
REBECCA L. HUDSMITH, LA Bar #7052
Federal Public Defender
Middle and Western Districts of Louisiana
102 Versailles Blvd., Suite 816
Lafayette, Louisiana 70501
(337) 262-6336

# CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements:

1.    This brief complies with the type-volume limit of Fed.R.App.P. 35(b)(2)(A) because this brief contains 3,860 words, excluding the parts of the document exempted by Fed.R.App.P. 32 (f), and thus does not exceed 3,900 words.

2.    This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because: this brief has been prepared in a proportionally spaced typeface using Word in Times New Roman typeface with a 14-point font.

3.    The undersigned understands that a material representation in completing this certificate, or circumvention of the type-volume limits may result in the Court's taking striking the brief and imposing sanctions against the undersigned counsel.

*S/ Rebecca L. Hudsmith*
Rebecca L. Hudsmith, La. Bar #7052

**Attorney for Len Davis**

Dated: October 5, 2020

# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 21, 2020

Lyle W. Cayce
Clerk

No. 19-70010

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

LEN DAVIS,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:12-CV-752
USDC No. 2:94-CR-381-1

Before OWEN, *Chief Judge*, and WILLETT and OLDHAM, *Circuit Judges*.
ANDREW S. OLDHAM, *Circuit Judge*:

Len Davis was an officer in the New Orleans Police Department ("NOPD"). He used his position and the NOPD's resources to orchestrate the murder of Kim Groves. The United States prosecuted Davis for capital murder. A jury convicted him. He was sentenced to death. Davis unsuccessfully appealed and then moved for postconviction relief under 28 U.S.C. § 2255. The district court denied his claims and denied him a Certificate of Appealability ("COA"). We likewise deny a COA.

No. 19-70010

I.

A.

On October 10, 1994, Kim Groves witnessed an NOPD police officer pistol-whipping her nephew. *See United States v. Davis*, 609 F.3d 663, 670 (5th Cir. 2010). That quite obviously upset Groves. So she filed a police-brutality complaint with the NOPD's office of internal affairs. *See ibid.* It turns out that the pistol-whipper policeman was Len Davis's NOPD partner, Sammie Williams.

Davis learned of the police-brutality complaint on October 12, 1994. Davis was enraged. So Davis called a drug dealer named Paul Hardy and asked him to murder Groves. Davis and Hardy routinely exchanged favors. On this occasion, Davis offered to help plan the murder; then, after Hardy committed it, Davis would cover Hardy's tracks at the crime scene. *Ibid.*

On October 13, 1994, Davis invited Hardy and another accomplice, Damon Causey, to the police station so that they could see crime-scene photos. *Ibid.* Davis then drove them around in his police cruiser so that Hardy could see Groves's neighborhood. *Ibid.*; *United States v. Causey*, 185 F.3d 407, 415 (5th Cir. 1999).[1] Later that same night, Davis drove around in his police cruiser looking for Groves. When Davis spotted her, he paged Hardy and then gave him Groves's location. *Causey*, 185 F.3d at 415. Hardy went to that location, found Groves, and shot her in the head. Groves died. Sitting by his police radio an hour or two later, Davis heard police chatter about a murder. He radioed an on-duty officer to confirm Groves was dead. She was 32 years old.

---

[1] The United States prosecuted Davis, Causey, and Hardy together. And the defendants appealed together. We first considered their appeals together in the *Causey* case, which is why we cite it for the factual and procedural background of Davis's case.

While Hardy upheld his end of the bargain, Davis did not. The FBI had been wiretapping Davis as part of an investigation into drug sales and corruption in the NOPD—"Operation Shattered Shield." *Davis*, 609 F.3d at 671. These Shattered Shield recordings included Davis's calls with Hardy and Davis's conversations planning Groves's murder. With this evidence in hand, the Government indicted Davis for (1) conspiring to deprive Groves's civil rights, in violation of 18 U.S.C. § 241, (2) depriving her of those civil rights under color of law, in violation of 18 U.S.C. § 242, and (3) tampering with a witness by planning the murder of Groves after she filed a complaint with the NOPD, in violation of 18 U.S.C. § 1512(a)(1)(c). *Causey*, 185 F.3d at 411. The Government sought the death penalty.

At trial, the jury heard from Davis's former partner, Williams, about the plan to murder Groves. Williams recounted the steps Davis took while on-duty and in their police cruiser to arrange for the murder. Williams also was with Davis for a number of wiretapped phone calls and was able to provide the jury with information about those calls. For instance, the Government asked Williams what it meant when Davis said, "I can get 'P' to come do that whore now and then we handle the 30." Williams explained that Davis was arranging for Paul Hardy ("P") to kill Kim Groves ("that whore") and that Williams and Davis would "write the [police] report whereby any evidence and any involvement with Paul Hardy would be eliminated"("handle the 30"). Williams also testified that Davis "started jumping up and down in joy" when he got confirmation over his police radio that Groves was murdered. Davis said, "Yeah, yeah, yeah, rock, rock-a-bye"—a reference to a movie where the assassin said "rock-a-bye-baby" every time she killed someone. The jury convicted Davis and recommended a death sentence. The district court imposed it.

No. 19-70010

## B.

On appeal, Davis challenged his §§ 241 and 242 convictions. *See Causey*, 185 F.3d at 411. Davis argued, *inter alia*, that the jury had insufficient evidence that he organized the murder of Groves while acting "under color of law." Under Supreme Court and Fifth Circuit precedent, the Government needed to prove beyond a reasonable doubt that (1) Davis "misused or abused his official power" and (2) "there is a nexus between the victim, the improper conduct[,] and Davis's performance of official duties." *Causey*, 185 F.3d at 415 (citing *West v. Atkins*, 487 U.S. 42, 50 (1988); *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 452 n.4 (5th Cir. 1994) (en banc)). The panel found that the Government proved Davis acted "under color of law":

> Davis misused or abused his official power to access the police station, the police car, and police radio to plan, execute, and cover up [Groves's] murder. The evidence of a nexus between that abuse and the crime is likewise sufficient. Davis's status as a police officer put him in the unique position to "handle the thirty" and thus offer protection to Hardy from the consequences of the murder. The motive for the crime arose from a complaint lodged by Groves against Davis in his official capacity[;] it was facilitated by the ability of Davis to case the area in his police car without arousing suspicion and to offer assurance of police protection to his accomplices.

*Id.* at 415–16.[2]

Although the panel upheld Davis's §§ 241 and 242 convictions, it vacated his conviction for witness tampering and remanded for resentencing.

---

[2] The text of 28 U.S.C. § 242 requires that the defendant act "under color of law," but the text of § 241 does not. Nevertheless, our court has construed § 241 to include a requirement that the defendant engage in "state action." *United States v. Tarpley*, 945 F.2d 806, 808 & n.2 (5th Cir. 1991). The appeal panel considered this requirement to be coextensive with § 242's "under color of law" requirement. *Causey*, 185 F.3d at 413–14.

After a subsequent appeal, *see United States v. Davis*, 380 F.3d 821, 829–30 (5th Cir. 2004), Davis's resentencing began in 2005. *See Davis*, 609 F.3d at 672. A jury once again recommended a death sentence. *Id.* at 672–73. On appeal from this death sentence, Davis argued yet again that "the evidence was insufficient to prove the 'color of law' element" for §§ 241 and 242. *Id.* at 697. But the panel declined to review his argument since Davis previously raised it on appeal. *Ibid.* After thoroughly reviewing his other arguments, the panel affirmed Davis's death sentence. *Id.* at 699.

Davis then challenged his conviction and sentence on numerous grounds in a § 2255 motion. He sought to proceed pro se. The district court granted Davis's request but appointed standby counsel. That generated *another* appeal over whether Davis's § 2255 motion should include 29 grounds (as standby counsel wanted) or only 19 grounds (as Davis wanted). We agreed with Davis. *See United States v. Davis*, 629 F. App'x 613, 618 (5th Cir. 2015) (per curiam). The district court then reviewed "the disorganized, duplicative[,] and redundant" arguments supporting Davis's 19 grounds in his 278-page motion, and the court denied them all. *United States v. Davis*, No. CR 94-381, 2018 WL 1419351, at *3 (E.D. La. Mar. 22, 2018). The district court further denied a COA.

Davis timely applied for a COA from this court.

## II.

Before a federal prisoner can seek appellate review of a district court's denial of his § 2255 motion, he must first "obtain a COA from a circuit justice or judge." *Buck v. Davis*, 137 S. Ct. 759, 773 (2017); *see* 28 U.S.C. § 2253(c)(1)(B). A COA is jurisdictional—"[a] Court of Appeals may not rule on the merits of [the prisoner's] case" until a COA has issued. *Buck*, 137 S. Ct. at 773; *see also Miller-El v. Cockrell*, 537 U.S. 322, 335–36 (2003). And

a COA may only issue if the prisoner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

To determine if a COA applicant has made that showing, we ask a "threshold question": has the applicant shown that "'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further'"? *Buck*, 137 S. Ct. at 773 (quoting *Miller-El*, 537 U.S. at 327). This is not a "full consideration of the factual or legal bases adduced in support of the claims." *Miller-El*, 537 U.S. at 336. Instead, we "ask 'only if the District Court's decision was debatable.'" *Buck*, 137 S. Ct. at 774 (quoting *Miller-El*, 537 U.S. at 327).

In his application, Davis raises three claims that he says demonstrate "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). We review each claim in turn. *See Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997) ("COAs are granted on an issue-by-issue basis.").

A.

First, Davis requests a COA on his claim that he was deprived "his constitutional right to the effective assistance of counsel at his 1996 guilt phase trial." *See Strickland v. Washington*, 466 U.S. 668, 686 (1984). The Court has said that "[t]he Sixth Amendment right to counsel 'is the right to the effective assistance of counsel.'" *Buck*, 137 S. Ct. at 775 (quoting *Strickland*, 466 U.S. at 686). To show the deprivation of effective counsel, a prisoner "must show both that counsel performed deficiently and that counsel's deficient performance caused him prejudice." *Ibid.* (quoting *Strickland*, 466 U.S. at 687). The district court found Davis's *Strickland* claim wanting because his "mere conclusions about [his] lawyer's performance [were] not enough to give rise to a credible assertion of a

deficiency," and because Davis "fail[ed] to demonstrate a level of prejudice that is required by the *Strickland* standard."

Davis argues that his counsel provided ineffective assistance by not "investigat[ing], litigat[ing], or argu[ing] the weaknesses of the 'under color of law' element." According to an affidavit prepared for the purpose of his § 2255 motion, Davis's trial counsel asserts that he should have done more investigating, and he had no "strategic reason" for not doing so. For instance, trial counsel asserts that if only he'd known that Davis had a pre-existing personal acquaintance with Groves, he would have used that to dispute the Government's theory that Davis killed Groves because of her police-brutality complaint. Davis also provides another affidavit from a private investigator, which asserts that Davis and Groves had "long-standing friction" and "personal hatred."

We need not decide whether Davis has made the requisite showing of his counsel's deficiency because no reasonable jurist could debate that Davis suffered no prejudice. *Buck*, 137 S. Ct. at 776. In order to show prejudice, there must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ibid.* (quoting *Strickland*, 466 U.S. at 694). "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). And when a court assesses prejudice, it "must consider the totality of the evidence before the judge or jury" because "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 695–96. Thus, the question for a COA is, in light of the totality of evidence, has Davis shown "a reasonable probability" that the result of his trial would have been different if his attorney had done more investigating into the "color of law" requirement and found Davis's personal history with Groves? *Buck*, 137 S. Ct. at 776.

The answer is plainly no. The evidence for the "under color of law" requirement was overwhelming. *See Strickland*, 466 U.S. at 696. Davis put his plan into action the day after learning of Groves's complaint with NOPD. *Causey*, 185 F.3d at 415. On the day of her murder and while on-duty, Davis "paged Hardy and Causey, discussed with them his plan to have Groves killed, met with them in the police station, then took them in his police car to show them the area that Groves frequented." *Ibid.* While cruising Groves's neighborhood later that night—on-duty and in his police car—he spotted her "and paged Hardy to give him Groves's location." *Ibid.* And Hardy went to go kill Groves with an assurance that Davis would take care of any evidence at the crime scene. *Ibid.* The jury heard this assurance through Davis's own voice in taped conversations and through Davis's partner's testimony. This was far more than enough to show Davis "used or abused his official power" and there was "a nexus between the victim, the improper conduct[,] and Davis's performance of official duties." *Causey*, 185 F.3d at 415.

Moreover, Davis fails to show what difference additional information about his relationship with Groves would make. For instance, the jury already heard testimony that Davis and Groves had known each other prior to the filing of the complaint that led to her death. ("Q: Did [Groves] actually name Len Davis by name [in the complaint]? A: Yes, she did. Q: Did she indicate that she had known him prior in some manner? A: Yes, she did."). And Davis does not show why that personal relationship would undermine his conviction given longstanding precedent that §§ 241 and 242 convictions can arise out of crimes committed for personal reasons. *See, e.g.*, *United States v. Tarpley*, 945 F.2d 806, 809 (5th Cir. 1991) (holding a "jealous husband" who beat up his wife's ex-lover still acted under color of law because he used his official status as a police officer to claim he could kill the other man, he summoned another police officer to join him in threatening the man, and the officers chased the man "out of town in their squad car"); *cf. Cooks v. United*

*States*, 461 F.2d 530, 532 (5th Cir. 1972) (holding that counsel is not "ineffective" for failing to "foresee future pronouncements which will dispossess the court of power to impose a particular sentence which is presently thought viable" under current precedent).

Instead of making that showing, Davis appears to relitigate the "under color of law" issues that he presented in his first appeal. That is not the role of federal postconviction review. "[A] collateral challenge may not do service for an appeal." *United States v. Shaid*, 937 F.2d 228, 231 (5th Cir. 1991) (en banc) (quotation omitted). And once a claim is raised and adjudicated on direct appeal, the prisoner cannot re-raise the claim under § 2255 absent a change in law. *See, e.g.*, *United States v. Kalish*, 780 F.2d 506, 508 (5th Cir. 1986). Davis's ineffective assistance of counsel claim is therefore not debatable.

## B.

Davis next requests a COA on his claim that his Sixth Amendment right to a jury trial was compromised by "the adverse impact of external influences and misconduct" during his 1996 guilt-phase trial. The district court considered this argument in conjunction with an argument that the jurors were biased. Ultimately, the district court determined that "these claims [were] without merit. . . . [I]t is worth remembering that in all respects there is overwhelming record evidence of [Davis's] guilt in a horrendous federal crime. There is no factual or constitutional basis warranting the relief [he] request[s]."[3]

---

[3] Davis argues that the district court applied the wrong standard in reviewing his claim about external influences on the jury. Even if the district court did apply the wrong standard, "§ 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'" *Miller-El*, 537 U.S. at 336. As a consequence, it is not enough for Davis to simply say the district court was wrong; Davis

No. 19-70010

The Supreme Court has held that the Sixth Amendment forbids "jurors from being subjected to 'private communication, contact, or tampering' and considers any such external influences presumptively prejudicial." *Oliver v. Quarterman*, 541 F.3d 329, 335 (5th Cir. 2008) (quoting *Remmer v. United States*, 347 U.S. 227, 229 (1954)). But Davis fails to point to any external influences in his COA briefing. For instance, Davis complains about the fact that his jury was sequestered during his trial. But Davis himself requested that sequestration. And, more to the point, Davis points to "absolutely no evidence" that even "suggests" that anyone "tried to talk to [the jurors] about the trial." *United States v. Fryar*, 867 F.2d 850, 853 (5th Cir. 1989) (denying "external influence" claim). Nor does he indicate that any of the officials charged with shepherding the sequestered jurors said anything inappropriate. *See Parker v. Gladden*, 385 U.S. 363, 363 (1966) (per curiam) (reversing conviction because "a court bailiff assigned to shepherd the sequestered jury . . . stated to one of the jurors in the presence of others . . . 'Oh that wicked fellow [defendant], he is guilty'").[4]

To the extent Davis relies on any evidence, that evidence reflects no external influence on the jury. He points to the declaration of a wife of a juror to describe her fear. But she wasn't on the jury, so her fears are irrelevant to Davis's jury-trial claim. *See Oliver*, 541 F.3d at 335 ("*Remmer* . . . prohibits *jurors* from being subjected to . . . external influences" (emphasis added)).

---

must show that under the right standard, "reasonable jurists" could debate the resolution of his claim. *Ibid.*

[4] In the district court, Davis made several arguments about several other alleged juror incidents, including one involving a juror's personal use of a Bible. But Davis did not raise those issues in his COA application before our court. He thus forfeited these arguments. *Hughes v. Johnson*, 191 F.3d 607, 613 (5th Cir. 1999) ("Issues not raised in the brief filed in support of [an applicant's] COA application are [forfeited]." (citing *Moawad v. Anderson*, 143 F.3d 942, 945 n.1 (5th Cir. 1998))); *Perillo v. Johnson*, 79 F.3d 441, 443 n.1 (5th Cir. 1996).

Davis then says one juror was dozing off during the trial and played with a "little gambling machine toy" to stay awake. But the Supreme Court has explained that there is a difference between external influence claims and so-called internal influence claims. *See Tanner v. United States*, 483 U.S. 107, 117 (1987). "[I]nternal influences . . . provide no basis for relief," and these "include allegations of physical or mental incompetence of a juror, such as claims that a juror was insane, could not sufficiently understand English, or had a severe hearing impairment." *Oliver*, 541 F.3d at 336 (citing *Tanner*, 483 U.S. at 119). Under the Supreme Court's framework, a dozing or game-playing juror is under a purely *internal* influence. And that's not a cognizable constitutional claim, *ibid.*, much less is it a debatable one.

## C.

The last constitutional claim for which Davis seeks a COA is that the Government withheld key evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The district court denied these claims because they had "no evidentiary basis and are merely Davis' conclusions and speculation." Jurists of reason could not debate that result.

"To establish a due process violation under *Brady*, a habeas petitioner must satisfy three elements." *In re Raby*, 925 F.3d 749, 759–60 (5th Cir. 2019) (citing *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)). "First, the evidence suppressed must be favorable to the defendant." *Id.* at 760. "Second, the [Government] must have suppressed the evidence," either willfully or inadvertently. *Ibid.* "Third, prejudice must have ensued—*i.e.*, the suppressed evidence must have been material." *Ibid.* (quotation omitted). For evidence to be material, Davis must show "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). For instance, a *Brady* violation occurs when "the favorable

evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

Davis argues the Government violated these standards in two ways. First, he argues that the FBI did not disclose the results of an internal investigation into Davis's wiretaps. The FBI conducted an internal investigation to determine why FBI officials, who were listening to Davis's calls while he planned Groves's murder, did not intervene to stop that murder. The investigation concluded that "based on Davis's historical language, involvement with [NOPD] complaints, personal references, abusive language[,] and use of the phone to conduct police business, Davis's activity . . . could be mistaken as routine." Thus, the FBI concluded it was understandable that the officials missed the significance of the calls at first.

Even if Davis showed that this evidence met the first two *Brady* elements, reasonable jurists could not debate the immateriality of this evidence. As the Government argued below, "[t]his report addressed why the [FBI] monitor did not catch the calls; it did not evaluate the quality of the evidence" or the meaning of the words that Davis actually used. And Davis makes no showing that this evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435; *see also Giglio v. United States*, 405 U.S. 150, 154 (1972) ("We do not, however, automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict." (quotation omitted)). After all, Sammie Williams heard the conversations firsthand and provided the jury with significant evidence about what Davis meant: he wanted Groves dead.

Second, Davis argues that the Government violated *Brady* by failing to fully disclose "302s." *See also Giglio*, 405 U.S. at 154. The term "302" refers to an FBI form bearing that number, which serves as an "official interview memorand[um]." *United States v. Cessa*, 861 F.3d 121, 128 (5th Cir. 2017). The FBI prepared these memoranda after talking with Williams. The Government provided Davis's trial counsel with redacted 302s for the trial. But during his postconviction proceedings at the district court, Davis obtained unredacted versions of the 302s. Davis now claims that the redactions violated *Brady* and *Giglio*.

Davis fails to make any showing that any particular part of these 302s would have impeached Williams or proved exculpatory in any way. *See United States v. Dillman*, 15 F.3d 384, 390 (5th Cir. 1994) ("Although exculpatory and impeachment evidence fall within the purview of *Brady*, neutral evidence does not."). Moreover, Davis fails to make any showing of materiality. He points to no specific redactions that if disclosed to the defense would have led to a different result in his trial. *See Bagley*, 473 U.S. at 682. For instance, Davis points to nothing that would have been vital to cross-examination, *see United States v. Sipe*, 388 F.3d 471, 483 (5th Cir. 2004), would have further developed "avenue[s] of impeachment," *ibid.*, or would have undermined any of the corroboration of Williams's account that the wiretapped conversations themselves provided, *see Cessa*, 861 F.3d at 129–30; *Rocha v. Thaler*, 619 F.3d 387, 396–97 (5th Cir. 2010) ("[T]he impeached testimony of a witness whose account is strongly corroborated by additional evidence supporting a guilty verdict . . . generally is not found to be material." (quotation omitted)). Davis's *Brady* claims are therefore not debatable.

Davis's application for a COA is DENIED.

III.

The district court also denied Davis's request for an evidentiary hearing. And Davis seeks a COA on that issue as well. But we have no power to issue such COAs. Congress specified that we can issue a COA "only if the applicant has made a substantial showing of the denial of a *constitutional* right." 28 U.S.C. § 2253(c)(2) (emphasis added). The denial of a *statutory* claim for an evidentiary hearing under § 2254(e)(2) obviously does not itself implicate a constitutional right.

That's why we have held that "a petition challenging an evidentiary ruling may only be entertained as *corollary* to a constitutional violation." *Norman v. Stephens*, 817 F.3d 226, 234 (5th Cir. 2016) (quotation omitted; emphasis added). To that end, a request for an evidentiary hearing stands or falls with the applicant's COA showing. *See ibid.*

When a prisoner has identified a substantial and reasonably debatable constitutional claim, we can issue a COA on that question. *See* 28 U.S.C. § 2253(c). The issuance of that COA is a matter of jurisdictional significance. *See Miller-El*, 537 U.S. at 336 (noting a COA "is a jurisdictional prerequisite"). It allows the prisoner to appeal. It allows us to consider the prisoner's arguments on the "specific issue or issues" that we've indicated in the COA. 28 U.S.C. § 2253(c)(3); *see Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997) (holding "our review of [the prisoner's] habeas petition is limited to the issue specified in the COA"). And we've held the issuance of a COA on a constitutional claim gives us the correlative power to consider the prisoner's statutory claim to an evidentiary hearing. *See, e.g.*, *United States v. Reed*, 719 F.3d 369, 371 (5th Cir. 2013); *United States v. Cavitt*, 550 F.3d 430, 442 (5th Cir. 2008); *United States v. Edwards*, 442 F.3d 258, 264 (5th Cir. 2006); *United States v. Cervantes*, 132 F.3d 1106, 1110 (5th Cir.

1998); *United States v. McMillen*, 96 F. App'x 219, 221 (5th Cir. 2004) (per curiam).

By contrast, when the prisoner has not identified a substantial and reasonably debatable constitutional question, we cannot issue a COA. *See* 28 U.S.C. § 2253(c)(2). And because a COA is a jurisdictional prerequisite to any appeal, *see Miller-El*, 537 U.S. at 336, we have no judicial power to do anything without it. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("'Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.'" (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868))). That's why we've held that when an applicant's "constitutional claims fail" to make the necessary showing for a COA, "we do not address the merits of [the] request for an evidentiary hearing." *Norman*, 817 F.3d at 234. We do not address those merits because, without a COA, we have no jurisdiction to do so. *See, e.g.*, *Alix v. Quarterman*, 309 F. App'x 875, 878 (5th Cir. 2009) (per curiam); *Lewis v. Quarterman*, 272 F. App'x 347, 351 (5th Cir. 2008) (per curiam) (deferring consideration of evidentiary hearing question, if and when "the merits are addressed in a subsequent opinion"); *McMillen*, 96 F. App'x at 221.[5]

---

[5] *Norman* also noted that, because Congress did not give us the power to grant COAs on statutory claims for evidentiary hearings, "[w]e . . . construe Norman's request for a COA on this issue as a direct appeal from the denial of an evidentiary hearing." 817 F.3d at 234. But the fact that Norman *attempted* to appeal directly from the denial of an evidentiary hearing does not mean that Norman *could* so appeal. Litigants of all kinds (including but not limited to prisoners) attempt to appeal from all sorts of things, even when they cannot. *See, e.g.*, *Lawson v. Stephens*, 900 F.3d 715, 719 (5th Cir. 2018) (holding a notice of appeal from a magistrate judge's decision is "a nullity"). That's why *Norman* did not "affirm" or "reverse" or otherwise exercise any jurisdiction whatsoever over the prisoner's request for an evidentiary hearing. The *Norman* panel simply denied the COA.

15

No. 19-70010

Because Davis has not made the requisite showing for the granting of a COA on his constitutional claims, we cannot issue a COA. And because we cannot issue a COA, we have no power to say anything about his request for an evidentiary hearing. *See Norman*, 817 F.3d at 234.

SO ORDERED.